IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

   *Plaintiff*,

v.

COLIN FROST,

   *Defendant*.

Criminal No. ELH-16-0582

**MEMORANDUM OPINION**

Defendant Colin Frost filed a pro se motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 41. Through appointed counsel, a second motion for compassionate release was filed. ECF 49. It is supported by a memorandum (ECF 51) and several exhibits. I shall refer to ECF 41, ECF 49, and ECF 51 collectively as the "Motion." The government opposes the Motion. ECF 54. It has also submitted several exhibits. The defendant has replied. ECF 59. And, the defense has submitted an additional exhibit. The defendant has also submitted a supplement (ECF 61), as well as an emergency second supplement (ECF 62).

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion.[1]

**I. Background**

Frost was indicted on December 6, 2016. ECF 1. On April 18, 2017, he entered a plea of guilty to the one count indictment (ECF 19), charging him with the offense of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The plea was tendered pursuant to a

---

[1] This Memorandum Opinion does not address defendant's motion to vacate under 28 U.S.C. § 2255. *See* ECF 31.

Plea Agreement.  *See* ECF 20.  Moreover, the plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a total sentence of 70 months' incarceration.  *Id.* ¶ 10.

The Plea Agreement included a Stipulation of Facts.  The Stipulation reflected that, on May 24, 2016, a Baltimore City Police Officer saw the defendant in the driver's seat of a parked vehicle talking with two people outside the car.  One of those individuals alerted Frost by saying: "Police!" ECF 20, ¶ 6.  The detective drove next to Frost's vehicle, and Frost "abruptly exited his vehicle bracing his right elbow and forearm against the side of his waist in a manner indicating possession of contraband."  *Id.*  The police officer noticed a "bulge" in the area where Frost had pressed his arm.  *Id.*  Frost "suddenly fled south" and, when Frost reached an alley, he jumped over a fence and injured his leg.  *Id.* at 5.  He then threw the weapon on the ground and instructed a passerby to run with the gun.  The individual refused to do so.  *Id.*

Frost was arrested and the firearm was recovered where Frost had thrown it. It was a .380 caliber, semi-automatic pistol.  *Id.*  Before any questioning, "Frost blurted out that he possessed the gun for protection."  *Id.*  A search of Frost, incident to arrest, led to the recovery of a baggie of heroin. *Id.* Without questioning, Frost volunteered that it was for "personal use."  *Id.*

Sentencing was held on May 31, 2017.  ECF 28.  Frost, born in October 1988, was 28 years of age at the time of his sentencing. The Court imposed the agreed upon sentence, with credit for time served from May 24, 2016, when the defendant was arrested by the State, until July 2, 2016, and from January 23, 2017 until the date of the Judgment, *i.e.*, May 31, 2017.  *See* ECF 29.  The sentenced corresponded to the bottom of the applicable advisory sentencing guideline ("Guidelines") range of 70 to 87 months.  *See* ECF 30.

The defendant was recently transferred from FCI Hazelton, a medium security correctional institution, to FCI Butner, another medium security facility.  *See* BOP Inmate Locater,

2

https://www.bop.gov/inmateloc/index.jsp (last accessed January 21, 2021); *see also* ECF 62. The defendant has served about 48 months of his 70-month sentence. This equates to about 68% of the sentence, exclusive of good time credits. With good time credit, he has a projected release date of December 15, 2021. ECF 54 at 2.[2] And, he will be eligible for home detention on June 15, 2021. ECF 59 at 3.

Frost, who is now 32 years of age, moved for compassionate release on May 4, 2020, citing his medical history. ECF 41; ECF 49. He made an administrative request on July 1, 2020. *See* ECF 54 at 2. The Bureau of Prisons denied the request on July 16, 2020. ECF 51-1 at 1.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v.*

---

[2] According to the Bureau of Prisons, the defendant's full sentence will expire on October 13, 2022.

*Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

4

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to

5

U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I)  suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.

However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[3]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[4] The World Health

---

[3] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). And, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. As of January 19, 2021, COVID-19 has infected more than 24.1 million Americans and caused over 400,200 deaths in this country. *See*

9

*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 19, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines have primarily been made available to health care workers and the elderly in nursing homes, but in recent days the criteria for eligibility has expanded. That said, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, once the BOP receives the vaccine, a prisoner at heightened risk will receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. According to a press release dated January 15, 2021, the BOP has administered 17,189 vaccine doses to staff and inmates at sixty-eight BOP institutions. *Update on COVID-19 Vaccinations*, U.S. Department of Justice, Federal Bureau of Prisons (Jan. 15, 2021), https://www.bop.gov/resources/news/pdfs/20210115_press_release_vaccination.pdf (last accessed January 19, 2021). As of January 15, 2021, 1,027 staff and 1,051 inmates have received a series of two doses. *Id.*

10

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance.  *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

11

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position

that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[5] As of January 19, 2021, the BOP had 123,052 federal inmates and 36,000 staff. And, as of the same date, the BOP reported that 4,718 inmates and 2,049 BOP staff currently tested positive for COVID-19; 38,535 inmates and 3,553 staff have recovered from the virus; and 190 inmates and three staff members have died from the virus. Moreover, the BOP has completed 98,614 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 19, 2021). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

At FCI Butner, where the defendant is now a prisoner, as of January 21, 2021, the BOP reported that 93 inmates and ten staff have tested positive for COVID-19 and 185 inmates and five staff have recovered at the facility. And, the facility has completed 718 tests. There has been one reported inmate death. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 21, 2021).

### IV. Discussion

Frost has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 51 at 2-3. Frost's medical history is quite significant. According to the medical records (ECF 51-1), defendant was recently diagnosed with

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

14

"a bicuspid aortic valve and severe aortic stenosis." *Id.* at 3. He was hospitalized in February 2020 for an aortic valve replacement and "underwent a[n] ascending aortic aneurysm repair." *Id.* Following surgery, defendant developed a "[r]ight brachial artery thrombus" and underwent thrombectomy. *Id.* at 3-4. And, eleven days after surgery, defendant "developed high degree AV block and underwent permanent pacemaker insertion with a single chamber pacemaker." *Id.* at 4.

The government agrees that Frost has met the "'extraordinary and compelling reason' prong" for compassionate release. ECF 54 at 10. But, it maintains that release is not warranted because his release would endanger the community. *See* 18 U.S.C. § 3142(g); *see also* ECF 54 at 10. Moreover, the government asserts that, "while Frost's medical conditions are serious, his medical records indicate that they are being adequately treated in BOP custody." ECF 54 at 8.

As both parties acknowledge, Frost has presented a medical condition that qualifies as a compelling basis to grant compassionate release. The CDC has recognized that serious heart conditions put people at an increased risk of contracting severe illness from COVID-19. *People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY. Accordingly, I am satisfied that Frost readily satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

The Court must next consider whether, if released, Frost would pose a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

15

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government urges the conclusion that Frost is a danger, citing, *inter alia*, the seriousness of Frost's offense and the defendant's prior criminal history. ECF 54 at 11. Frost acknowledges the seriousness of his offense. ECF 59 at 3. But he contends that his criminal history "does not indicate a propensity for violence" and he has been drug free since his arrest in January 2017. *Id.*

As I see it, the factors under § 3553(a) and § 3142(g) weigh in favor of reducing Frost's sentence. The defendant's physical deformity, discussed *infra*, coupled with his serious heart condition, suggests, as the defense urges, that he is "unlikely" to "initiate any violent confrontations" moving forward. ECF 59 at 3. Moreover, there is no history of violence in the defendant's background. The defendant's prior criminal record is notable for several relatively minor offenses, such as driving without a license. *See* Presentence Report ("PSR"), ECF 25, ¶¶ 28, 30, 31.

In particular, the defendant was convicted in 2008, at age 19, of conspiracy to distribute heroin, for which he was sentenced to three days of incarceration (time served). At age 20, he was convicted of possession of marijuana and sentenced to one day of incarceration, *i.e.*, time served. Also at age 20, he was convicted of attempted distribution of heroin, for which he was sentenced to one year of imprisonment, of which seven months and 29 days were suspended. *Id.* ¶ 36. He

16

subsequently violated his probation on two occasions, but received very short sentences. In 2011, the defendant pled guilty to possession of heroin and received a sentence of four years, with all but one day suspended. *Id.* ¶ 37. He violated probation, and was sentenced to 18 months of incarceration. In other words, defendant has already served a sentence far longer than any earlier sentence.

Further, the defendant has submitted numerous letters in support of him. *See* ECF 51-1. And, he notes that if released he plans to live with his fiancé, with whom he has had a relationship since 2013. *See* ECF 51 at 4. Moreover, he will collect "Social Security disability Benefits to which he is entitled" due to a surgical mishap that occurred when he was an infant that led to a deformed hand. ECF 51 at 4.

Moreover, as indicated, the defendant has been incarcerated for about 48 months, which equates to about 68% of the sentence, exclusive of good time credits. With good time credit, he has a projected release date of December 15, 2021. ECF 54 at 2.[6] And, he is eligible for home detention on June 15, 2021. ECF 59 at 3.

It is also noteworthy that Frost's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one

---

[6] According to the Bureau of Prisons, the defendant's full sentence will expire on October 13, 2022.

17

immeasurably greater than necessary"). Programming and recreation have either been limited or cancelled altogether, and visitation is either prohibited or restricted.

As I see it, Frost's incarceration for a period of 48 months is sufficient to serve the sentencing goals of incapacitation, deterrence, retribution, and rehabilitation. Accordingly, I find that the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing Frost's sentence to time served plus fourteen days, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with the added requirement of nine months of home confinement as a condition of supervised release.

## V. Conclusion

For the foregoing reasons, I shall grant the Motion.

An Order follows, consistent with this Memorandum Opinion.

Date: January 22, 2021  /s/
Ellen Lipton Hollander
United States District Judge